Good morning. May it please the court. I'm John Williams on behalf of the appellants. I'm going to reserve five minutes of my time for rebuttal, or at least try to do so. I'd like to use my time this morning to put a finer point on a few key issues in this case. And I'd like to start with the plaintiff's discrimination claims, and then I'll speak about the retaliation claim after that. Plaintiffs raised direct evidence of discriminatory intent by Ferrer in this case. Under this court's authority in the Chuang case, this court previously held that very little direct evidence of discriminatory intent is needed to defeat summary judgment. Here, all three plaintiffs brought that evidence forward. With respect to Gonzales, during his first ride-along with Gonzales, Ferrer stated that he needed to fire female employees before they became pregnant. At their next ride-along, Ferrer told Gonzales that he had a firing timeline to make sure that those female employees were fired before they became pregnant, and asked Gonzales herself why she never had kids or if she planned to become pregnant. As to Boyd, after reassigning two of Boyd's accounts to a new male salesperson, Ferrer informed Boyd that he believed a male sales representative would better serve the old boy network in those key accounts. He criticized her presentation skills as being too motherly, and he told her to keep her presentations simple and use analogies that you're comfortable with, like baking a cake. With respect to Colombo, Ferrer would always, and that was a direct quote, ask Colombo if she was pregnant again, when she planned on having another child, and berated her for giving away her baby clothes in an incident that underscored his concern with her becoming pregnant again. All of those comments demonstrate direct evidence of discriminatory animus towards all three plaintiffs. Now, there's been some argument that these are just mere stray remarks, and I think we briefed this in both our opening brief and our reply, but the Reed v. Google case, the California Supreme Court case, did a thorough analysis of the stray remark doctrine and looked at its origins and reached the conclusion that it's a jury that should judge the probative value of those remarks, that they should be admitted and heard by a jury, and that's really why we're here today. It's our position that all of that evidence should be before a jury, and that these three plaintiffs who suffered this discriminatory conduct and comments by their direct supervisor should be viewed in the aggregate. One of the primary errors that we could glean from the district court's analysis was that the district court tended to pull these three plaintiffs apart and not see this as a continuum of conduct, even though they suffered all of the same conduct directed from the same supervisor. And I'd also mention, in addition to Reed's position with respect to those stray remarks, this court in Chuang and the California Courts of Appeal in Pantoja have said that the very kind of me-too evidence that the district court found couldn't be considered in terms of connecting the dots between these three women and their treatment by their same supervisor is actually relevant and should be heard by the fact finder, that that evidence can demonstrate discriminatory intent, even if those statements or that conduct did not take place in front of one of the individual plaintiffs. So, again, the district court erred in failing to look at that me-too evidence. Clearly, we're here on de novo review, but that's powerful evidence in this situation because it was so consistent. The other thing I'll say in terms of circumstantial evidence. Before we get to that, Mr. Williams, may I direct your attention to Ms. Boyd? At her deposition, she was asked if there were any other statements made by Mr. Ferrer, and she said there weren't. Doesn't that contradict her affidavit and make her affidavit of no value? I don't believe so, Your Honor. I think that's a ‑‑ if you're asking me if it's a sham declaration, if it rises to that level. We normally have a rule that regardless what a declarant puts in her affidavit or his affidavit, if at the deposition the testimony is directed against it, we disregard the affidavit. I understand. And I think the Van Arsdale case is a case that we talked about. A lot of times there's a distinction to be made between what is actually asked in a deposition, whether the question, what the call of the questions were, and then whether the affidavit itself is contrary to that or whether it elaborates on a point or whether it adds to a point that wasn't asked. So I guess my response in this situation is that there's no clear conflict that would require the court to disregard the affidavit, that the issue of what she heard, what she knew about would be a question of fact for the jury, and that it doesn't arise to that level of a clear conflict. All right. Thank you. I did want to mention some of the substantial evidence with respect to the performance spreadsheets. I have another question, and you haven't touched on this yet. Suppose we find that the evidence against Mr. Ferrer is sufficient to reverse as to him because of the statements that he made as to direct evidence. The decision to terminate these three plaintiffs was made by somebody other than Mr. Ferrer, and there's no indication that Mr. Ferrer had any control over the decision-making persons. Does that save the employer in this case? I don't think so, Your Honor. Why? We discussed this because of the Katzpah theory imputes liability to the company based upon what Ferrer did. In this case, too, it shouldn't be overlooked that all of the folks who were on the decision-making team who put together these spreadsheets, which, again, contained erroneous information as to all three plaintiffs, all of these decision-makers, Ms. Sweeney, Ms. Bilbao, who were with compliance, Stanley Austin, who was the director of commercial operations in the western area, Ms. Samaha, head of human resources, Ms. Howard, all of these folks were aware of the plaintiff's complaints. So they weren't isolated from them when they made the decisions that they did by placing these folks on these spreadsheets for these layoff decisions and, again, used erroneous calculations to qualify them for layoff in those spreadsheets. So my answer to you would be that the decision-makers were not immune from what Ferrer did. They knew about it. They supposedly investigated it, although we know Howard's investigation was woefully incomplete. It wasn't documented according to company protocol. Aren't you saying that the facts put forward by an investigator control the decision-making function of the committee, of the team? I mean, it's sort of saying like when the FBI starts an investigation, the district court is influenced by that? What I'm saying is that everybody on the decision-making team was aware of the complaints made by the plaintiffs against Ferrer. Right. They did not follow their own protocols in investigating those complaints. And, moreover, this court's decision in Poland, in addition to the state court appeal. How did they not follow their protocol? For example, Howard, who investigated the complaints on behalf of the human resources, who reported to Samaha, who was on the team that made these termination decisions, she never followed up with any of the other employees of Ferrer. She never called Colombo. Who's she, Samaha? I'm sorry, Howard. Howard. And it was only when Colombo called her that she got any information. And then she was required to produce documentation of that investigation, and no documentation was ever produced. She was required to give a written report of her investigation to Gonzales. She never did that. She ultimately said, after speaking only to Ferrer and to Gonzales, this is a he said, she said, and no further action would be taken. That violated company protocol in terms of the level of investigation and also the lack of documentation on that investigation. And then you cited Poland. Yes, and so, alternatively, in Poland and in Reeves, both this court and the state court have said that if a lower level employee like Ferrer puts in motion an investigation, in this case he put the plaintiffs on, at least Boyd and Colombo, on OSPs, which were plans for remedial action that make them targets for later termination. Then the Kasparov theory imputes his discriminatory animus towards the ultimate decision makers. I've already detailed in this case how the decision makers in this case were aware of these complaints. But even absent that, it's our position that the Kasparov theory, under both Poland and Reeves, would reach that decision making team. And so when you talk about the Kasparov theory, you're talking about the decision makers being influenced by Ferrer? Being influenced, but also by Ferrer putting in motion by his original discriminatory acts that would make these three plaintiffs be subject to further scrutiny. For example, putting them on the OIs. And company policy says, I'm sorry, not the OIs, the OSPs. And the PIPs. And the PIPs. And the company policy says when you do that as a supervisor, this is supposed to be remedial. You're supposed to have a discussion with these folks about taking corrective action. The record evidence here is that when Ferrer did this with Boyd, and when Ferrer did this with Colombo as well, that he was not available to them. That he didn't have any discussions with them about how to correct any of the issues that supposedly supported the OSPs. He didn't create any documentation as the company protocol required to demonstrate why they were put on OSPs in the first place. So here he is raising their profile for further disciplinary action. Out of what? Out of his discriminatory animus because they're women. And then they ultimately get included in spreadsheets for a layoff based upon erroneous criteria. Information which is disputed in which the spreadsheets themselves are inconsistent with their performance reports from relevant periods right before the termination occurred. Do you want to mention the retaliation claim? Yes, thank you, Your Honor. It's hard to imagine more compelling direct evidence of retaliatory animus than a threat by the CEO telling Gonzalez that she should quit her complaint. That if she did not quit or detente, that the company was happy to lawyer up. And the fact that the company then brought in an outside lawyer to be part of that termination team in where Gonzalez was targeted for termination is direct evidence of discriminatory intent under this case, this court's prior case in Bergen. I'm happy to talk about the circumstantial evidence, the temporal aspect, how Gonzalez was a high-performing salesperson, fifth out of 160 in the prior year, never had a negative report, never had a negative review until what? Until she reports for error and then all of a sudden she's a target for PICUN compliance violations. The fact that she had worked for eight years without any issues and then within four months is terminated after she reported is compelling circumstantial evidence of discriminatory animus under this court's, I'm sorry, under the California court decision in Flate. So there are many tribal issues here, even with respect to these compliance violations. Gonzalez was given mere hours to review this compliance warning letter before she had to respond to it in a conference call. She disputed it. She continues to dispute the factual basis upon which those compliance violations were brought up, yet the company didn't want to hear that. All of that combined is both direct and circumstantial evidence of retaliatory animus. Do you think Gonzalez has a stronger case of retaliation than the three of them have with regard to discrimination? I don't know if I can make that qualitative assessment. I think there's direct evidence in this record of both discriminatory animus and of retaliatory animus. The distinction I think perhaps Your Honor is making is that the direct evidence with respect to retaliation comes from above. With respect to the evidence of discriminatory animus, it came from both below and above. And so I think that that's for a jury to determine in terms of the strength. What do you mean above and below? You mean subordinates and management? Correct. Okay. Correct. With that, I'll reserve the balance of my time. Thank you. Okay. Good morning. May it please the Court, Joe Conant on behalf of Organogenesis. I originally had some prepared statements, but I think I'm going to audible if that's okay and just hit some of the issues that Mr. Williams raised because I suspect those may be the issues. You've been watching the Super Bowl, huh? Those may be the issues that the Court is struggling with. So I want to hit two that I think came up in these questions that I think may help drive our discussion. First, Mr. Williams repeatedly refers to direct evidence. And that's not an insignificant distinction, as Mr. Williams realizes, because if there's direct evidence, then it's easy to get past the summary judgment burden and then get to the... Direct evidence of animus. That's right. And Your Honor is going exactly where I'm going. But if it's a circumstantial evidence case, then plaintiffs would need to show specific and substantial evidence that this discriminatory reason or retaliatory reason was the real reason. So that delta between direct evidence... That's the burden. But on summary judgment, they just have to demonstrate a triable issue of fact. And haven't they done that? Well, let's take the retaliatory termination claim. Haven't they at least shown triable issues of fact as to pretext for Gonzalez's termination? I don't think so, Your Honor. And I don't think it's even close. Because the only evidence of direct evidence of retaliatory motive, as Mr. Williams just explained, is that apparently Mr. McKay said something about stop or we'll get lawyers or something like that. Two issues are really important there. Number one, there is no evidence that Mr. McKay had any role in the decision. Right? There's no admissible evidence. There's no specific substantial evidence. There's no evidence at all that the CEO said get rid of her or I don't like this. I want you to push her out. Zero. So what you have is this one comment allegedly that he made, but it has no tie to the actual decision here. But even if you look at the comment, it's not even particularly nefarious. I mean, I guess it's tempting and it's easy for us as lawyers to pitch things and make them look mean. But if you look at it, the CEO is saying if everything is believed, you can, telling the employee, you can either escalate this, which surely doesn't seem like someone who wanted to avoid a dispute would say, or we can stop, which is what I think detente means. We'll all sort of just let things stay where they are. Or we can get lawyers. I don't think that is the type of evidence that anyone could conclude that there is this evil motive out there. So even if you assume it was said, I'm not sure that it shows what the argument is trying to show that it shows. And he wasn't involved in the decision, so it really doesn't matter. But I guess turning back then to direct evidence, why is that important? Well, direct evidence is that kind of evidence that you don't have to show anything else for it to be enough, right? You don't need inference, no additional evidence, no nothing. And that evidence isn't here in this case, either on the discrimination side or on this retaliation case. So and how do we know that? Plaintiffs admitted it below. So if we look in the record during the summary judgment, I think it's on page 655 of the record. They admit this is a circumstantial evidence case. And that's why this issue of direct evidence is a very smart way to try to avoid the substantial evidence issue that they have in terms of the overall evidence and what they need to show in order to beat summary judgment. The second issue, this cat's paw, which I think is interesting. And I think it is another way to avoid when there isn't enough evidence to actually show that the decision makers relied upon the wrong stuff. We make some argument, well, they must be an instrumentality of someone else. No, that's based on our case in Poland, which I think was 2007, written by Judge Gould, where we held that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decision maker that leads to an adverse employment action, the subordinate's bias is imputed to the employer. If the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decision-making process. And so here we have the fact that Ferrer initiated all these investigations and employment-type sanctions that started the chain of events that ended up with these three women being terminated and having adverse employment actions. So I think that's pretty solid law on that point. I don't disagree with Your Honor. I think Your Honor's reading of Poland is spot on. I just read from it, so I hope so. I was surprised that appellants have relied on Poland so heavily because I think Poland proves why summary judgment had to be granted. So what Poland specifically also stands for is the fact that somebody rolls out the reason that starts sort of a chain of events, that's not enough. But isn't it enough to get over the summary judgment? No, it is not enough to get over summary judgment. Poland was talking about what has to be proved ultimately to prevail on the merits and the evidence that's been—by the way, is Ferrer still with the company? He's not, Your Honor. Interesting. Yeah. But you have to—I mean, just to get over—all he has to do is show a triable issue of fact. And there's a lot of chain of events that Ferrer did, was involved in, and it's undisputed. He instigated them, and he was involved with them, after having said very questionable statements to all three women when they had to ride along with him on these trips.  Let's assume for purposes of our analysis that he said everything that's alleged, and I will concede that it's awful, and that type of evidence could be really important in a different type of case. But here it's not, because he didn't make the termination decision, and Poland, I think, stands for the really important point that, number one, you can't just—if somebody starts this process, it's not fruit of the poisonous tree. It's not just because the beginning of it was started by this bad person with this bad intent, later events somehow don't get—can't be relied upon or aren't appropriate or can't be independent. And what Poland also— Well, it could be. I mean, it could be. All I'm saying is that they've raised enough— I think they've raised enough facts that there's at least an inference that can be drawn as to this cat's paw theory that it's now become called, and then the company can come back and prove that, no, they weren't influenced in their decision-making by anything Ferrer did. They were actually operating independently. Right. And I understand Your Honor's point, but I respectfully disagree that this is exactly why we have the summary judgment process where you need the specific substantial evidence, that what you can't show is that bad person A starts the ball rolling, and then events happen later. What Poland says is the person who starts it isn't enough, but you have to show that that bad actor was pervasively influencing whatever happened. Right? Take a look at ER 1003. This is from Pat. That's Pat Bilbo. We have, of course, considered the information provided by Oscar, and this will be further investigated and evaluated next week when Senga is in California and will meet with Oscar and then do a ride-along with Angela on Thursday. So that's one of the teams saying we are considering, of course, what Ferrer said. Right? Yes and no. I think, Your Honor, and I'm not going to go back and look at this in detail right now and waste the Court's time, but I think what it also says right after that is we need to do an independent review of this ourselves, and we can't be influenced. The word independent doesn't appear in her e-mail. It says further investigate. Right, right, right. And then, Counsel, don't we have to look at the evidence in the light most favorable to the non-moving party? Absolutely. And draw those reasonable and logical conclusions? And if there's any facts, you can't grant summary judgment. Absolutely agree, Your Honor. But I think the key in these cases is that they're a little bit different. Let me just ask you this. Sure. For example, in the retaliation claim. Okay. There's a complaint, there's an adverse action, and then the third element is simply that you can show some connection between the two. That's right. And that's all you have to show. Well, you have to show a connection that would be reasonable enough for a thoughtful fact finder to conclude that retaliation was the real reason. So it's not binary, but it is. And then if you look at the evidence in the light most favorable to the non-moving party, that is the plaintiffs, then if there's any questions of fact, you have to deny summary judgment. Of course. That's absolutely the structure. And see, I almost get the impression that you want us to look at the evidence in the light most favorable to your client in some ways. Well, I wouldn't be doing my job, Your Honor, if I were to ask you that question. What I want the court to appreciate is that plaintiff makes the argument that this is holistic, right? And in a way, it is. But when we look at it in a holistic way, it's not is there a speck of sand in the water. It is more weighing than a district court would typically do in a summary judgment case because of this specific substantial issue. So I think many district courts are used to sort of looking, and they get persuaded by this Monday stew-type argument where, okay, we take whatever's left over from the weekend, we throw it in the stew, and hopefully at the end of the day it tastes good enough, and then there must be something in there. That's not what this is. What we need to do in these cases is, look, who's the decision-maker? What did the decision-maker decide, and who was involved in that? Who was motivating that? And here, all we know is the bad guy wasn't involved, right? And we know there's an independent investigation by these compliance people who nobody alleges was biased, right? They did their job, and they ultimately make the decision, and no one says they're bad people. So I think it is tempting to say, well, he started it, or he did this, and they relied on it. But when we look at the evidence in more detail, it's not really what it is. Let me ask you this. Prior to Gonzales, had Farrar ever reported anybody for compliance violations? I don't believe there's any record of that. So she was the first one. We don't know. We don't know if she's one of a series. Doesn't show anyone else. But what the record also doesn't show, Your Honor, are what we would typically see is other people who did similar compliance violations but who didn't get in trouble, right? In a case like this, we would normally see something like that, or maybe changing reasons for the termination. We don't see that either. We don't see statistics. So all of the markers that one would typically use to show that this decision was retaliatory, it was biased, we don't have any of that. We have irregularity of investigation and temporal proximity, which are also factors that we're supposed to consider. That's a great point. On those investigatory irregularities, assuming those happen, those are four or five months earlier, and if one really looks at the record, there is extensive evidence of what the HR people did. But assume it's true, right? Assume that they didn't do a great job investigating this. None of that has anything to do with what ultimately happened with the terminations later on. It's entirely separate. I suspect that if one looks at any of these circumstances, you can always find someone who didn't do a job as great as they would have liked to, or there are mistakes in a spreadsheet. But the issue is, is there evidence from which a reasonable person could conclude that the real reason is because, you know, the company doesn't like women. And I'd respectfully suggest there is not evidence of that, and the Court below appropriately ruled on that. I think my time is up. Is there anything else I can answer before I sit, Your Honors? Thank you very much. Thank you very much, counsel. Thank you. I'll give you a minute. You're over your time. Thank you, Your Honor. Judge Drain, you asked the question, prior to Gonzales, did Ferrer ever report anybody else for compliance violations? Prior to Gonzales making her report, Ferrer never reported Gonzales for compliance violations. He said things to Gonzales that made her feel like she was valued, and then when she makes this report, all of a sudden these compliance issues come up. You know, I have to say there's a little bit of false contrition here. I know that the defendants want to separate the team that terminated these folks from Ferrer, but we have to remember Ferrer was reprimanded by the company and told to go to a class to help manage aerial communications. Never did that. Never was informed by the company to do that. The company never enforced that. So to the extent there is an effort here to create the separation, there's a lot of things that the company did that didn't take appropriate action with respect to Ferrer when they knew it, and those people were on the decision-making panel that ultimately made these decisions about the plaintiffs. Unless there's any further questions, I'll submit. Thank you, Counsel. Thank you. Gonzales v. Organogenesis is submitted, and this session of the C.A.R. is ended for today. All rise.
judges: Wardlaw, Bea, Drain